<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>QUINCY PALMER,<br><br>      Defendant. | Crim. No. 22-00282 (GC)<br><br>**MEMORANDUM OPINION** |

<u>**CASTNER, District Judge**</u>

      This matter comes before the Court upon Defendant Quincy Palmer's second amended pre-trial omnibus motion.  (ECF No. 32.)  The Government opposed, and Defendant replied.  (ECF Nos. 35 & 37.)  The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1.[1]  For the reasons set forth below, and other good cause shown, Palmer's motion is **DENIED IN PART**, and the Court reserves its decision on the remaining issues that will be addressed prior to trial.

**I.**      <u>**BACKGROUND**</u>

      On September 3, 2021, Patrolman Joseph Sangiovanni of the Clinton Township Police Department initiated a traffic stop of a blue Chevrolet Trailblazer driving on Route 78 West.  (ECF No. 34-1 at 2.)  A video captured by Sangiovanni's motor vehicle recorder (MVR) depicts the Chevrolet passing the patrol car, frequently applying its brakes, drifting outside of its lane several

---

[1]      Local Civil Rule 78.1 is applicable to criminal cases in the District of New Jersey. See L. Civ. R. 1.1.

times, and nearly drifting into an adjacent vehicle.  (Gov't Ex. 1 (MVR) at 00:10 to 00:45.)  Sangiovanni also claims that one of the vehicle's headlights was out, although this is not captured on any video.  (ECF No. 34-1 at 2.[2])  Sangiovanni ran a search on the Chevrolet's registration on his computer and discovered that it had expired on July 15, 2021.  (*Id.*)  After Sangiovanni activated his vehicle's emergency lights and siren, the Chevrolet continued driving for about a minute before pulling over in the right shoulder lane.  (Gov't Ex. 1 at 1:00 to 2:05.)  Sangiovanni approached the driver (later identified as Palmer) and asked for his driver's license, registration, and proof of insurance.  (Gov't Ex. 2, Sangiovanni Body-Worn Camera (BWC), at 2:00 to 3:25.)  Palmer provided a New York learner's permit bearing the name "Dion Snype" and the vehicle's title, but no registration or proof of insurance.  (*Id.*)  Palmer advised that the vehicle was not registered because he had just purchased it.  (*Id.*)  The picture on the learner's permit did not depict Palmer, but another individual.  (ECF No. 34-1 at 3.)  The other documents showed that the vehicle had been purchased in 2020.  (*Id.*)  At Sangiovanni's direction, Palmer exited his vehicle and sat down on the nearby highway guardrail.  (Gov't Ex. 2 at 11:10 to 11:25.)  Shortly thereafter, two other officers arrived at the scene.  (*Id.*)

When asked whether his name was "Dion," Palmer stated "Yes."  (*Id.*)  Palmer also again claimed to have purchased the vehicle "today."  (ECF No. 34-1 at 3.)  Sangiovanni also claims to have witnessed "some type of object between his waistband and under his shirt on his left hip" because "his t-shirt did not fall flat and I could see some type of straight horizontal line where the shirt slightly sat on top of the item."  (*Id.* at 3-4.)  Sangiovanni claims that Palmer's inconsistencies, nervous manner, and apparent object beneath his shirt caused Sangiovanni "concern," but that he

---

[2]     Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

wanted to keep Palmer "calm." (*Id.*)

Sangiovanni asked Palmer for consent to search his vehicle. (Gov't Ex. 2 at 12:50.) After initially providing consent, Palmer refused to sign a consent form. (*Id.* at 15:00.) Palmer began to grow agitated and appeared to be in distress. (*Id.*) Sangiovanni claims that based on Palmer's nervous manner, "moving his hands in a fast fidgety manner throughout the investigation," his apparent untruthfulness, and the alleged object beneath his shirt, Sangiovanni felt that "based on the totality of circumstances up to this point," he was in fear of his life and felt that he needed to "frisk this individual for weapons." (ECF No. 34-1 at 4.) As the officers attempted to frisk Palmer, Palmer physically resisted. (Gov't Ex. 2 at 17:50.) During the ensuing struggle, Palmer fell over the guardrail he had been sitting on. (*Id.* at 18:30.) The two other officers on the scene, Patrolman Brian Dickson and Sergeant Andrew McCluskey, claim that during the struggle, they heard a metal item hit the ground. (ECF No. 34-1 at 6, 8.) Patrolman Dickson then saw a gun on the ground next to Palmer and moved the gun away from Palmer. (*Id.* at 8.) Palmer was handcuffed and placed in a police vehicle. (*Id.*)

The weapon was a .45 caliber Armscor semiautomatic pistol. (ECF No. 35 at 14.) The Government claims that according to a New Jersey State Police Office of Forensic Sciences laboratory report, the weapon is operable and was purportedly stolen in Reading, Pennsylvania. (*Id.*)

On November 19, 2021, Palmer was charged in a criminal complaint in the District of New Jersey for possessing the firearm "knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year in the United States District Court for the Southern District of New York," in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) On April 14, 2022, a grand jury indicted Palmer for possessing the firearm "knowing that he had previously

been convicted of a crime punishable by imprisonment for a term exceeding one year" in violation of § 922(g)(1).  (ECF No. 13.)  Pending before the Court is Palmer's second amended pre-trial omnibus motion, in which Palmer seeks a dismissal of the indictment, suppression of all statements and evidence produced as a result of an unlawful seizure, and various other forms of relief.

II.    **DISCUSSION**

   A.    **Motion to Dismiss**

   Palmer moves to dismiss the indictment raising facial and as-applied constitutional challenges to § 922(g)(1).  The Court addresses each challenge in turn.

   *1.    Palmer's As-Applied Challenge to § 922(g)(1)*

   The Second Amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  But the right to bear arms under the Second Amendment is not "unlimited."  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  The United States Supreme Court in *Heller* explained that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."  *Id.* at 626-27; *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (recognizing that the Second Amendment does not preclude such longstanding regulatory measures as prohibitions on the possession of firearms "by felons and the mentally ill").

   More recently, in *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held that the Second Amendment protects law-abiding citizens' right to carry firearms in public for their self-defense.  597 U.S. 1, 9 (2022).  In so holding, the Court refined the test that courts must apply when determining whether application of a firearm law is constitutional — that is, "when the Second Amendment's plain text covers an individual's conduct, the Constitution

presumptively protects that conduct" and the Government must then justify its firearm law by demonstrating "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

Under this framework, Palmer must first show that the Second Amendment applies to Palmer and his proposed conduct. *Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023). If it applies, the burden of proof falls on the Government to show that §922(g)(1) as applied to Palmer is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 103 (quoting *Bruen*, 597 U.S. at 24.)

First, the Government concedes that under *Range*, Palmer is one of "the people" protected by the Second Amendment. (ECF No. 35 at 19.) *See also United States v. Velazquez*, Crim. No. 23-657, 2024 WL 49690, at *12 (D.N.J. Jan. 4, 2024).

Next, the Government argues that Palmer has not met his burden of showing that he possessed the weapon for a constitutionally protected purpose. (ECF No. 35 at 22.) *See, e.g.*, *Range*, 69 F.4th at 103 (finding that the defendant's request to "possess a rifle to hunt and a shotgun to defend himself at home" falls under the constitutionally protected purposes defined in *Heller*). But the Court need not resolve this question because even if Palmer's conduct is covered by the Second Amendment, the Government has met its burden in showing that § 922(g)(1) as applied to Palmer is "consistent with the Nation's historical tradition of firearm regulation." *See United States v. Boone*, Crim. No. 22-233, 2024 WL 965146, at *5 (Mar. 6, 2024) (citing *Porter v. United States*, Crim. No. 22-6199, 2023 WL 6366273, at *4-5 (D.N.J. Sept. 28, 2023)).

Under *Bruen*, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's . . . historical understanding." 597 U.S. at 26. Because the Second Amendment may "apply to circumstances beyond those the Founders specifically anticipated," to

justify a restriction on firearm possession, the Government may "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 28-30; *see also Range*, 69 F.4th at 103.

Accordingly, here the Court must determine whether the Government has identified historical analogues showing that the Nation historically disarmed defendants like Palmer. *See Range*, 69 F.4th at 103; *Velazquez*, 2024 WL 49690, at *13. And in its opposition brief, the Government points to "clear historical support for restricting the possession of firearms by persons who, like Palmer, repeatedly committed felony crimes," citing colonial and early state laws that disarmed individuals who "posed a potential danger" to others. (ECF No. 35 at 31-33 (collecting cases).) Palmer is alleged to have previously been convicted of five felonies under New York and federal law, including third-degree robbery, second-degree attempted robbery, second-degree attempted assault, first-degree attempted making or possessing dangerous contraband in prison, and unlawful possession of a firearm as a convicted felon. (*See id.* at 14-15.) The Government also cites seventeenth-century and early-twentieth-century laws restricting the ability to own weapons for individuals who were convicted of "paradigmatic violent crimes," such as robbery and assault. (*Id.* at 36.) The Court is satisfied that the Government has demonstrated that Palmer is alleged to be the type of individual the Founders would have categorically disarmed as a threat to the public's safety. *See Velazquez*, 2024 WL 49690, at *13 (finding that § 922(g)(1) is constitutional as applied to a defendant previously convicted of firearms trafficking); *Boone*, 2024 WL 965146, at *8 (finding § 922(g)(1) constitutional as applied to a defendant previously convicted for drug trafficking and a weapons violation).

Palmer argues that *Range* supports a finding that Palmer is not the type of individual who historically would have been disarmed. (ECF No. 34 at 17.) But the *Range* defendant's prior

6

conviction for a false application for food stamps had occurred over twenty-five years earlier, and the Third Circuit expressly stated that under those circumstances, its decision "is a narrow one." *Range*, 69 F.4th at 98, 106. Palmer also cites *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), where the United States Court of Appeals for the Ninth Circuit vacated the defendant's conviction under § 922(g)(1) despite the defendant's five prior felony convictions. (ECF No. 37 at 2.) But as Palmer concedes, Duarte's prior convictions were for the non-violent offenses such as vandalism, felon in possession of a firearm, drug possession, and evading a peace officer. (ECF No. 37 at 2.) *Duarte*, 101 F.4th at 691. The Ninth Circuit noted that Duarte's vandalism conviction "would have made him a misdemeanant at the Founding," and that the Government failed to prove that the other convictions "trace[] back to an analogous, Founding-era predecessor." *Id.* But here, the Government has provided analogous precedent showing that individuals like Palmer who had been previously convicted of crimes such as assault and robbery were historically disarmed. (ECF No. 35 at 36.) And neither *Range* nor *Duarte* hold that "§ 922(g) is unconstitutional as applied to all felonies." (*See* ECF No. 37 at 2.)

For these reasons, enforcing § 922(g)(1) against Palmer does not violate his Second Amendment rights.

### 2. Facial Challenge

A facial constitutional challenge to a statute requires a showing that the statute is "unconstitutional in all of its applications." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Put differently, Palmer must demonstrate "that no set of circumstances exists under which [§ 922(g)(1)] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

First, because Palmer cannot show that § 922(g)(1) is unconstitutional as applied to him,

his facial challenge must fail. *See, e.g.*, *Velazquez*, 2024 WL 49690, at *14 (citing *Mitchell*, 652 F.3d at 416 ("Because the statute is constitutional as applied to [defendant], he has not shown that 'there is no set of circumstances' under which the statute may be applied constitutionally.")).

Second, as multiple other courts in this district have observed, nothing in the Supreme Court's opinion in *Bruen* overturned the language in *Heller* and *McDonald* affirming the constitutionality of "longstanding prohibitions on the possession of firearms by felons." *See Boone*, 2024 WL 965146, at *4 (noting that "the Supreme Court's decision in *Bruen*, *Heller*, and *McDonald* all squarely reject Defendant's argument that Section 922(g)(1) is facially unconstitutional"); *Porter*, 2023 WL 6366273, at *4 (stating that the court "does not find that the *Bruen* Court intended to abrogate or overturn *Heller* and *McDonald*"); *Velazquez*, 2024 WL 49690, at *14 (collecting cases in which "courts throughout the country have consistently rejected facial challenges" of § 922(g)(1)). Indeed, "several Justices went out-of-their way to clarify that *Bruen* said nothing about the validity of felon disarmament laws like § 922." *Velazquez*, 2024 WL 49690, at *11 (citing *Bruen*'s two concurring and one dissenting opinions, each of which affirm that the *Bruen* opinion does not cast doubt on longstanding prohibitions on the possession of firearms by felons). The Court, therefore, finds that § 922(g)(1) is not facially unconstitutional.

### 3.    *Vagueness*

Palmer next asks the Court to dismiss his indictment because § 922(g)(1) is unconstitutionally vague. (ECF No. 34 at 23.) A criminal statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). Vagueness attacks do not prevail where "reasonable persons would know their conduct puts [them] at risk of punishment under the statute." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (cleaned up).

Palmer contends that "not all persons with convictions can be disarmed consistent with the Second Amendment" because the defendant in *Range* was not precluded from possessing a firearm despite his prior felony, contrary to the "plain text of § 922(g)(1)." (ECF No. 34 at 24.) Thus, "a person of ordinary intelligence then would not be able to be on notice of the parameters and limits of the statute." (*Id.*)

But a statute is impermissibly vague only if it is subject to "seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. Here, as the Government argues, whether the statute offends the Second Amendment is a separate issue properly litigated in an as-applied challenge as in *Range*. *See also United States v. Ames*, 2023 WL 5538073, at *3 (E.D. Pa. Aug. 28, 2023) ("Whether [§ 922(g)(1)] offends other constitutional rules . . . is properly litigated in applied challenges."). (ECF No. 35 at 39.) In addition, the plain text of § 922(g)(1) is "explicit and readily understandable." *United States v. Zion*, Crim No. 22-527, 2024 WL 1975497, at *6 (D.N.J. May 3, 2024). As such, multiple other courts in this district have found even post-*Range* that § 922(g)(1) is not unconstitutionally vague on its face. *See, e.g.*, *id.*; *United States v. Ladson*, 2023 WL 6810095, at *5 (E.D. Pa. Oct. 16, 2023) (finding that just because "the Second Amendment might . . . constitutionally preclude punishment in certain instances should not lead us to conclude" that § 922(g)(1) is unconstitutionally vague); *Ames*, 2023 WL 5538073, at *3 (same).

### 4.    *Commerce Clause*

Palmer argues that § 922(g)(1) exceeds the original scope of the Constitution's Commerce Clause "before the Supreme Court adopted an expansive conception of the Commerce Clause." (ECF No. 34 at 26 (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937)). But he "recognizes that this argument is foreclosed by the existing case law," including the *NLRB* decision. (*Id.* at 27.) Given this clear precedent, the Court finds that § 922(g)(1) does not violate

Congress's Commerce Clause powers.  *See also Zion*, 2024 WL 1975497, at *7 (same).

     **5.**       *Lack of Specificity*

Palmer argues that the indictment must be dismissed for lack of specificity under Fed. R. Crim. P. 12(b)(3)(B)(iii), which provides that defendants may move to dismiss for any defect in the indictment, including a "lack of specificity."  (ECF No. 34 at 27.)  Palmer contends that the indictment "fails to place Palmer on sufficient notice of the prior conviction for which the grand jury found probable cause and against which Palmer must defend at trial."[3]  (ECF No. 34 at 27 (footnote omitted).)

An indictment is facially sufficient if it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.  *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (citation omitted).  Further, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution."  *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (citation omitted).

Section § 922(g) makes it a crime for any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm."  And here, the indictment charges in relevant part:

        On or about September 3, 2021, in Hunterdon County, in the District of New Jersey and elsewhere, [Palmer], knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a loaded

---

[3]     Palmer does not concede the existence of any prior conviction.  (ECF No. 34 at 27 n.14.) The Court discusses Palmer's alleged prior convictions only for the purposes of ruling on Palmer's motion to dismiss, and not as a finding that the alleged prior convictions exist.

firearm, namely, an Armscor (Rock Island Armory) semiautomatic pistol bearing serial number RIA1432303, and the firearm was in and affecting commerce.  In violation of . . . Section 922(g)(1).

[(ECF No. 13 at 1.)]

Here, the indictment contains the date and location of Palmer's alleged violation, a detailed description of the firearm that Palmer allegedly possessed, and the federal law that Palmer allegedly violated.  Therefore, it sufficiently alleges the elements of the crime charged.  The indictment's references to the date, location, and the firearm's serial number adequately apprise Palmer of the nature of the charges against him and would allow Palmer to invoke double jeopardy in the event of a subsequent prosecution.  *See, e.g.*, *United States v. Weingartner*, 485 F. Supp. 1167, 1184-85 (D.N.J. 1979).

Palmer does not cite any legal authority showing that a dismissal of an indictment of § 922(g)(1) is warranted where the indictment does not state the exact underlying convictions on which it is predicated.  And other courts, in the context of determining whether to issue a bill of particulars, have considered the Government's opposition papers when determining whether the defendant is sufficiently apprised of the charges against him.  *See, e.g.*, *United States v. Moss*, Crim No. 19-701, 2021 WL 1196451, at *7 (D.N.J. Mar. 30, 2021) (finding that the Government's opposition papers "adequately apprise Defendant of the allegations and charges against him" by specifying the particular narcotics and firearm on which the indictment was based); *United States v. Caruso*, 948 F. Supp. 382, 393 (D.N.J. 1996) (denying a bill of particulars request because the Government had represented to the Court that it had provided discovery that "fills in the outline of the indictment"); *United States v. Parlavecchio*, 903 F. Supp. 788, 795-96 (D.N.J. Oct. 20, 1995) (finding that beyond the indictment itself, the Government provided further information in its opposition brief apprising him of its more specific allegations).  Here, the Government has

represented that it has produced material required under *Brady v. Maryland*, 373 U.S. 83 (1963) (ECF No. 35 at 49), and Palmer acknowledges that the Government discovered a "rap sheet" indicating that "Palmer has several convictions."  (ECF No. 34 at 27 n.14.)  Further, the Government's opposition papers specify the five alleged prior felony convictions on which its indictment is based, including each specific offense, date, and corresponding sentence.  (ECF No. 35 at 14-15.)  Accordingly, it cannot be said that Palmer lacks notice of the charges against him and what he must be prepared to meet at trial.  *See Moss*, 2021 WL 1196451, at *7.  Palmer's motion to dismiss on this basis is therefore denied.

### 6.    *Discovery of Grand Jury Transcripts*

A court may authorize disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii). "As a matter of public policy, grand jury proceedings generally must remain secret except where there is a compelling necessity."  *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir.1989) (citation omitted).  Palmer must show a "particularized need" for that information which outweighs the public interest in secrecy.  *Id.*  But here, the Court has ruled that Palmer has not shown that grounds exist to dismiss the indictment for lack of specificity.  Because Palmer is adequately on notice of the evidence that he will have to meet at trial, Palmer has not demonstrated a need for grand jury transcripts that outweighs the public interest in secrecy.   Accordingly, Palmer's request for transcripts of the grand jury proceeding is denied.

### B.    Motion to Suppress

Palmer moves to suppress all physical evidence and statements stemming from the traffic stop that occurred on September 3, 2021 on two bases.  First, Palmer argues that the motor vehicle

stop was pretextual and not justified at its inception.  (ECF No. 34 at 30.)  Second, Palmer argues that even if the stop were initially lawful, the stop was unlawfully extended beyond the minimum period necessary to issue a traffic warning or citation.[4]  (*Id.*)

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV.  A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (citations omitted).

Traffic stops are "reviewed under the investigatory framework first articulated in *Terry v. Ohio*," 392 U.S. 1 (1968).  *Id.*  Under *Terry*, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Id.* (quoting *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir.2000)).  "Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence,' and only a 'minimal level of objective justification' is necessary for a *Terry* stop."  *Id.* (cleaned up) (first quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); then *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  "Where reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed."  *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012).

Palmer contends that the traffic stop was pretextual and not justified at its inception because Palmer was the victim of racial profiling by the officer who pulled him over.  (ECF No. 34 at 30.) Palmer does not allege any facts demonstrating that the stop was pretextual other than Palmer's

---

[4]    Palmer does not challenge the constitutionally of the officers' frisk of Palmer for weapons or the Government's statement in its opposition papers that "the Government understands that Palmer concedes that the frisk was constitutional."  (ECF No. 35 at 45 n.7.)  Accordingly, the Court need not address the constitutionality of the officers' frisk of Palmer.

contemporaneous accusation of racial profiling.  (ECF No. 34 at 30.)  Courts have long recognized that even "pretextual stops supported by reasonable suspicion do not run afoul of the Fourth Amendment."  *Lewis*, 672 F.3d at 237; *Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that subjective intentions "play no role in ordinary, probable-cause Fourth Amendment analysis" and that while "the Constitution prohibits selective enforcement of the law based on consideration such as race . . . the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment").

Here, Sangiovanni's MVR shows Palmer's vehicle traveling close to the car in front of him; frequently applying its brakes; and swerving out of its lane several times, nearly drifting into a white van in the adjacent lane.  (*See* Gov't Ex. 1 at 0:01 to 1:05.)  As the video demonstrates, Sangiovanni initiated his emergency lights and conducted the traffic stop immediately after witnessing this behavior.  (*Id.*) Thus, Sangiovanni had sufficient reasonable suspicion to conduct the stop because he possessed specific, articulable facts indicating that Palmer had violated a traffic law at the time of the stop.  *See Delfin-Colina*, 464 F.3d at 398; *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (noting the "bright-line rule that any technical violation of a traffic code legitimizes a stop"); *cf. Lewis*, 672 F.3d at 879 (finding that a vehicle's illegal window tints could not have justified a traffic stop where there was no evidence that the officers observed the window tints before stopping the vehicle).

Palmer next argues that the stop was unlawfully extended beyond the minimum period necessary to issue a traffic warning or citation.  (ECF No. 34 at 30.)  "A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).   The officer executing the stop "may exercise reasonable superintendence over the car and its passengers," including ordering "the driver out of the vehicle

without any particularized suspicion." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).

The lawfulness of the stop "ends when task tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (holding that a traffic stop became unlawful when the officer extended the stop to conduct a dog sniff of the vehicle that was unsupported by reasonable suspicion). During the stop, the officer may inquire into matters unrelated to the justification for the traffic stop "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 355 (citation omitted). But if these additional inquiries do extend the duration of the stop, the seizure becomes unlawful unless supported by at least reasonable suspicion. *Id.* Moreover, "ordinary inquiries incident to a traffic stop," such as "checking the driver's license . . . and inspecting the automobile's registration and proof of insurance" are permissible. *United States v. Stewart*, 92 F.4th 461, 467 (3d Cir. 2024) (citing *Rodriguez*, 575 U.S. at 355). Checking the driver's license, registration, and insurance "are considered part of the traffic stop's mission because they serve its ultimate objective—to ensure roadway safety." *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018).

To determine whether a traffic stop was unlawfully extended, the Third Circuit (1) identifies the moment when the stop was measurably extended, which the Third Circuit calls "the '*Rodriguez* moment,'" and (2) determines whether the officer had reasonable suspicion of additional criminal activity at the time the stop was extended. *Stewart*, 92 F.4th at 467 (citations omitted).

Here, Palmer argues that his stop was unlawfully extended because he was held on the roadside for about fifteen minutes before the officers asked Palmer whether he would consent to a search of the vehicle. After Palmer declined to sign a consent form, the officers decided to frisk Palmer, all of which "was an unconstitutionally extended time under the circumstances." (ECF

No. 34 at 31-32.)  In response, the Government argues that the stop lasted for over fifteen minutes because the officers were "investigating Palmer's non-sensical explanation of why his car was not registered and his fraudulent learner's permit."  (ECF No. 35 at 43.)  Thus, according to the Government, the "*Rodriguez* moment" never took place because the officers continued to investigate infractions related to Palmer's learner's permit and registration, which the Third Circuit considers to be "part of the traffic stop's mission."  *Clark*, 902 F.3d at 410.

The Court finds that the Government has shown that the length of the stop was related to the officers' investigation into Palmer's license and registration, and was not unlawfully extended for an impermissible purpose.  Sangiovanni asked Palmer for his license, registration, and insurance at approximately 8:50 p.m.  (Gov't Ex. 2 at 2:05.)  During the remainder of the stop, the officers' actions related to their investigation into Palmer's learner's permit and lack of registration.  The officers inspected the documents provided by Palmer and asked Palmer about his learner's permit and his claim that he purchased the vehicle that day.  (*Id.* at 2:05 to 12:55.) The officers then asked for Palmer's consent to search his vehicle at approximately 9:01 p.m.  After Palmer initially consented to a search, he declined to sign a consent form.  Palmer's initial consent to the search, the officer's retrieval of the consent form from the police vehicle, and Palmer's decision not to sign the form all occurred within less than five minutes.  (*Id.* at 12:55 to 17:15.) These five minutes do not constitute an extension of the officers' investigation into Palmer's learner's permit and registration because a second officer continued to ask Palmer questions about the documents even as Sangiovanni retrieved the consent form.  (*See* Gov't Ex. 3 at 6:45 to 10:00.) Sangiovanni then informed Palmer that he was going to frisk him for weapons (Gov't Ex. 2 at 17:45 to 18:00), after which the struggle ensued that led to Palmer's arrest.

The District Court for the Western District of Pennsylvania's decision in *United States v.*

*Burrus* is instructive.  402 F. Supp. 3d 116 (2019).  There, the driver of a vehicle could not produce a valid license, registration, or insurance certificate during a traffic stop.  *Id.* at 120.  When the officer returned to his vehicle, he ran the defendant passenger's name through the National Crime Information Center (NCIC) database, which revealed that he had an active warrant for his arrest. *Id.*  Upon the defendant's motion to suppress, the court found that the officer's NCIC check "neither deviated from the mission of the traffic stop nor measurably extended same."  *Id.* at 123. The court reasoned that the traffic stop could not have been completed at the time the officer ran the NCIC check because none of the vehicle's occupants could produce driver's licenses, and the officer could therefore "not permit any of the occupants to drive the vehicle away from the scene without further investigation."  *Id.* at 124.  For this reason, the court denied the defendant's motion to suppress "because the alleged deviation from the mission of the traffic stop did not add any time to the investigation of same."  *Id.*; *cf. Clark*, 902 F.3d at 410-11 (affirming a district court's finding that an officer, who had confirmed the driver's license and registration but continued asking the driver questions about his criminal activity, extended the traffic stop without reasonable suspicion.)

Similarly here, the officers never extended their investigation of Palmer's learner's permit and registration, which "are considered part of the traffic stop's mission because they serve its ultimate objective—to ensure roadway safety."  *Clark*, 902 F.3d at 410.  Palmer argues that "the continued detention beyond the minimum period necessary to issue a traffic warning or traffic citation was an unreasonable further detention without just cause." (ECF No. 34 at 30.)  But unlike the defendant in *Clark*, Palmer did not present a valid license and registration that would have allowed him to receive a citation and lawfully drive away.  *See Burrus*, 402 F. Supp. 3d at 125.

Nor does Palmer identify the officers' request to search his vehicle as a "*Rodriguez*

moment," or the moment when the stop was extended beyond the minimum period necessary to issue a traffic warning or citation. Even if the officers' request for consent to search Palmer's vehicle could be considered "unrelated" to their investigation into Palmer's license and registration, officers may inquire "into matters unrelated to the justification for the traffic stop . . . so long as the inquiries do not measurably extend the stop's duration." *Johnson*, 555 U.S. at 783. Nothing in the record shows that the officers' request for consent occurred after their investigation into Palmer's license was—or "reasonably should have been"—completed. *Rodriguez*, 575 U.S. at 349. Again, another officer continued to ask Palmer to explain his missing registration and the discrepancies with his learner's permit during the few minutes it took for Sangiovanni to retrieve the consent form. (*See* Gov't Ex. 3 at 6:45 to 10:00.) Thus, the request for consent to search Palmer's vehicle, even if "unrelated" to the investigation into Palmer's license and registration, did not unlawfully extend a stop that was otherwise complete — especially where the officers had not received any confirmation of Palmer's ability to lawfully drive away following the issuance of a citation. *See Burrus*, 402 F. Supp. 3d at 125.

### 1.  *Evidentiary Hearing*

Palmer argues that because there are colorable issues of material fact as to whether Palmer's Fourth Amendment rights were violated, an evidentiary hearing is required. (ECF No. 34 at 34-35.) But evidentiary hearings on motions to suppress evidence are not granted as a matter of course. *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010). Instead, to require a hearing, a suppression motion must raise "issues of fact material to the resolution of the defendant's constitutional claim." *Id.* (quoting *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir.1996)). "A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a

colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." *Id.*  To be "colorable," the defendant's constitutional claim must consist of "more than mere bald-faced allegations of misconduct."  *Voigt*, 89 F.3d at 1067.

Moreover, the purpose of an evidentiary hearing is "not to assist the moving party in making discoveries that, once learned, might justify the motion after the fact."  *Hines*, 628 F.3d at 105.  Rather, the defendant's suppression motion must identify "specific and concrete" issues of material fact that may affect the Court's resolution of the motion.  *Id.* (citing *Voigt*, 89 F.3d at 1067; *United States v. Blackman*, 407 F. App'x 591, 594-95 (3d Cir. 2011)).

As previously discussed, Palmer's contention that the initial stop was "pretextual" is not a colorable constitutional claim because even if it were true, "pretextual stops supported by reasonable suspicion do not run afoul of the Fourth Amendment."  *Lewis*, 672 F.3d at 237. Sangiovanni's MVR showing Palmer's vehicle traveling close to the car in front of him, frequently applying its brakes, crossing into other lanes, and nearly drifting into an adjacent vehicle shows that Sangiovanni possessed sufficient reasonable suspicion at the time of the stop. *See Petersen*, 662 F.3d at 201 (noting the "bright-line rule that any technical violation of a traffic code legitimizes a stop").  Thus, Palmer has not presented a colorable constitutional claim, nor does Palmer identify any material dispute as to the initial stop that would necessitate a hearing.

Further, Palmer's arguments that the "suspicious timing" of the officers' decision to frisk Palmer "warrants flushing out at an evidentiary hearing" is the type of argument that the hearing might "assist the moving party in making discoveries that, once learned, might justify the motion after the fact."  *Hines*, 628 F.3d at 105.  Palmer has not identified "specific and concrete" issues of fact that could be resolved at a hearing or would change the Court's finding in this case that Palmer's traffic stop was not unlawfully extended.  *See Clark*, 902 F.3d at 410 (finding that

inquiries regarding license and registration during a traffic stop "are considered part of the traffic stop's mission"); *United States v. Johnson*, 615 F. Supp. 3d 296, 307 (M.D. Pa. 2022) (denying a defendant's motion to suppress statements made during an interrogation for *Miranda* violations where the entire interview was recorded on video and there were no disputes of material fact to be resolved at an evidentiary hearing).

For the foregoing reasons, Palmer's motion to suppress is denied in its entirety without the need for a further evidentiary hearing.

### C. Motions *In Limine* and Pretrial Discovery

Palmer's omnibus motion raises the additional following issues: (1) the admissibility of evidence that the weapon allegedly possessed by Palmer was stolen; (2) the admissibility of Palmer's alleged prior conviction of § 922(g)(1); (3) a request that the Court order the Government to disclose evidence that it will offer under Fed. R. Evid. 404(b); (4) a request that the Government immediately disclose evidence that may impeach the credibility of its witnesses ("*Giglio*" material); (5) and statements by Government witnesses such as investigatory notes and draft reports ("*Jencks*" material). The Court declines to reach these issues until after the Court schedules this matter for trial and sets a scheduling order directing the Government to provide the relevant disclosures. Palmer will be afforded an opportunity to challenge the sufficiency of the Government's disclosures and to renew his motions *in limine* pertaining to the admissibility of evidence.

III.   **CONCLUSION**

For the foregoing reasons, and other good cause shown, Defendant's second amended pre-trial omnibus motion (ECF No. 32) is **DENIED IN PART**, and the Court reserves its decision on the remaining issues that will be addressed prior to trial.

Dated: June 18, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

21